**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **MALLORY PATTERSON,** | ) | |
| **EMILY COMER, and** | ) | |
| **CARLA MCDOWNEY, on behalf of** | ) | |
| **themselves and all others similarly** | ) | |
| **situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  3:23-cv-757** |
| | ) | |
| **VIRGINIA DEPARTMENT OF** | ) | |
| **CORRECTIONS,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **CHADWICK DOTSON, in his official** | ) | |
| **capacity** | ) | |
| | ) | **TRIAL BY JURY DEMANDED** |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COME NOW Plaintiffs Mallory Patterson, Emily Comer, and Carla McDowney (collectively, "Plaintiffs") on behalf of themselves and all others similarly situated, by counsel, and allege as follows against Defendants Virginia Department of Corrections ("VDOC") and Chadwick Dotson, in his official capacity (collectively "Defendants"):

### PRELIMINARY STATEMENT

1.      No one should have their job threatened, be subjected to a strip search, or have their employment terminated simply because they are menstruating, using a feminine hygiene product,

or using a contraceptive device at work. Such conduct is sex discrimination in violation of federal law.

2.      Yet, even after admitting a fatal flaw in its security body scan screening process, which uniquely impacts females, and being found liable for intentional sex discrimination in employment for the same conduct, VDOC has continued to subject female employees to a hostile work environment, egregious terms and conditions of employment, and termination from employment all because they are menstruating or using a contraceptive device. No more.

3.      This action is brought by Plaintiffs, three current and former VDOC employees, on behalf of themselves and others similarly situated, to correct and remedy sex discrimination in employment by VDOC in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*., and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, as made actionable by 42 U.S.C. § 1983 ("Section 1983").

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

5.      Venue is proper for this Court pursuant to 28 U.S.C. § 1391 as VDOC is headquartered in this judicial district and division and a substantial part of the events giving raise to the claims occurred in this judicial district and division.

6.      Plaintiffs Patterson and Comer have exhausted all required administrative procedures and timely filed formal class-action complaints with the Equal Employment Opportunity Commission ("EEOC") for the Title VII claims.[1] The EEOC has issued Notices of

---

[1] Plaintiff McDowney has not yet filed an EEOC Charge at the time of this filing, but she is a proper party pursuant to the "single-filing rule" because all Plaintiffs' claims are substantially similar and Patterson and Comer's EEOC Charges gave notice of the Charges' collective nature. *See White v. BFI Waste Servs., LLC*, 375 F.3d 288, 293 (4th Cir. 2004), *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 490 n.11 (4th Cir. 1981).

Right to Sue and this suit has been brought within 90 days of Plaintiff Patterson's and Comer's receipts of such Notices. No administrative exhaustion is required for the Section 1983 claim.

## PARTIES

7.      Plaintiff Mallory Patterson is a female U.S. citizen and resident of Albuquerque, New Mexico. Patterson was employed at VDOC's Indian Creek Correctional Center in Chesapeake, Virginia as a Therapeutic Community Counselor from June 2021 until December 2021.

8.      Plaintiff Emily Comer is a female U.S. citizen and resident of Chesapeake, Virginia. Comer was employed at VDOC's State Farm Correctional Center in Goochland County, Virginia as a Licensed Practical Nurse ("LPN") from April 2020 until April 2022.

9.      Plaintiff Carla McDowney is a female U.S. citizen and resident of King George County, Virginia. McDowney has been employed at VDOC's Haynesville Correctional Center in Richmond County, Virginia as a correctional officer in training since August 2023.

10.      Defendant Virginia Department of Corrections is the executive agency responsible for operating and maintaining correctional facilities within Virginia.

11.      Defendant Chadwick Dotson is the Director of VDOC and is sued in his official capacity for prospective injunctive relief only.

## FACTUAL ALLEGATIONS

### I.  VDOC has a uniform policy and practice of using body scanners on employees.

12.      At all times relevant hereto, VDOC has utilized a full-body security X-ray scanning system ("body scanners") at its correctional facilities in the Commonwealth. Correctional facilities where the body scanners are utilized include Indian Creek Correctional Center, State Farm Correctional Center, Haynesville Correctional Cetner, Augusta Correctional Center, Buckingham

Correctional Center, Coffeewood Correctional Center, Greensville Correctional Center, Fluvanna Correctional Cetner, Nottoway Correctional Center, River North Correctional Center, Sussex I Correctional Center, and Sussex III Correctional Center.

13.     When an individual stands on the platform of the body scanner, it generates an image with a skeletal view of the human anatomy but does not produce medical quality images.

14.     At all times relevant hereto, VDOC has maintained a Standard Operating Procedure ("SOP") that requires all individuals entering a correctional center that is equipped with the body scanners to submit themselves to an examination by the body scanners.

15.     The SOP applies to employees, interns, volunteers, official visitors, or offender visitors. The SOP defines "employee" as a "any person who is paid by [VDOC] on an hourly, salaried, or contractual basis, or who is paid by another state agency or outside vendor for working in a position within [VDOC] or in a position that supervises offenders."

16.     The SOP further states that when an unknown object or anomaly is detected during the body scan screening of an employee, VDOC may authorize a strip search of the individual. The SOP defines "strip search" as a complete visual search of the body that requires a person to remove every article of clothing to permit a visual inspection of the person's breasts, buttocks, and genitalia.

17.     The SOP also states that refusal to submit to a search is justification for barring the employee from the facility and/or termination from employment. In practice, even if an employee submits to a search or a further search is not requested, VDOC may still bar the employee from the facility and/or terminate their employment based on an unknown object or anomaly being detected during the body scan.

## II.  VDOC has admitted it "Can't tell if it's drugs or a tampon."

18.    On or about September 17, 2018, VDOC's Chief of Corrections Operations, A. David Robinson issued a memorandum to all VDOC Regional Operations Chiefs, Regional Administrators, and Wardens that praised VDOC's body scan security technology and, cited to "recent inquiries about feminine hygiene products being an ideal way to conceal contraband," and advised that "offender visitors shall be notified that the use of tampons and or menstrual cup products are no longer permitted to be worn during visitation."

19.    The new VDOC policy was soon made public in national and local news articles. In response to the press, a VDOC spokeswoman stated that VDOC decided that facilities would offer pads to women who were wearing tampons while visiting a prison, so the tampons do not appear as possible contraband on a body scan.

20.    The new VDOC policy faced quick public backlash, including from members of the Virginia General Assembly, who criticized the policy as "bordering on sexual harassment and gender discrimination."

21.    In attempting to respond to the public questions and criticism and explain the policy, VDOC repeatedly stated, both internally and externally, that:

•      "Body scanners cannot differentiate between tampons/menstrual cups or other contraband in a body cavity."

•      "Unfortunately, this technology is not perfect, and it is not able to distinguish tampons from contraband."

•      "Unfortunately, while our body scanners are very helpful in the search for contraband, they can only tell us that something is in a body cavity, not what that something is."

- "We can't tell what's in someone as they go through a body scanner. We just can't tell if it's drugs or a tampon. It just shows if there's something wrong."

22.   Soon after the visitor tampon ban was made public and subjected to criticism, Virginia' Secretary of Public Safety and Homeland Security, Brian Moran, suspended VDOC's implementation of the policy.

23.   On information and belief, at no point did VDOC attempt to bar VDOC employees from wearing tampons or menstrual caps. However, the same issue of "not being able to tell if it's drugs or a tampon" applies to female employees wearing tampons, menstrual cups or contraceptive devices that pass through the same body scanner system as visitors.

**III.  VDOC has engaged in inaccurate and biased training for the body scanner system.**

24.   VDOC has compounded the use of its flawed body scanner technology by providing training materials on the body scanner system to VDOC employees that state: "*nothing* should be inside of the lower cavity of any person" (emphasis added) and that "most contraband will be concealed in the woman (sic) internal body cavity."

25.   VDOC's biased assumptions are contradicted by its own data which states that only 9% of contraband detected at its facilities was in any body cavity – let alone female body cavities in particular.

26.   The training materials also contain "baseline" slides with images of an individuals with a birth control device (IUD) and individuals with feminine hygiene products (tampon or menstrual cup). However, these images in the training materials are of *medical grade X-rays taken from the internet* and not an image from the actual body scanners, which produce a substantially lower grade image.

**IV.  VDOC has already been found liable for intentional sex discrimination on this issue.**

27.      In July 2019, Joyce Flores worked as a contracted dental hygienist at the Augusta Correctional Center until one day when she arrived at work while menstruating and utilizing a tampon and passed through the body scanner system. VDOC terminated Flores' employment on the pretext of a suspicious body scan image.

28.      In November 2020, Joyce Flores brought suit against VDOC in the U.S. District Court for the Western District of Virginia alleging sex discrimination in employment in violation of Title VII. *See Flores v. VDOC*, Case No. 5:20cv87 (W.D. Va.) [ECF No. 1].

29.      In February 2021, the Court denied VDOC's motion to dismiss, ruling that Flores had sufficiently alleged that she was discriminated against on the basis of her sex. *See Id.* [ECF No. 15], 2021 U.S. Dist. LEXIS 31857, 2021 WL 668802 (W.D. Va. Feb. 22, 2021) (J. Cullen) ("This leads the court to conclude, under the facts alleged, that but for Flores's menstruation and use of a tampon – conditions inextricable from her sex and childbearing capacity – she would not have been discharged. And discharge based on a woman's child-bearing capacity 'will always result in treatment of a person in a manner which but for that person's sex would be different.'" (citation omitted).

30.      In August 2021, the Court denied VDOC's motion for summary judgment, ruling that a reasonable jury could conclude that, but-for Flores' menstruation and use of a tampon – conditions inextricable from her sex – VDOC would not have terminated her employment. *See Id.* [ECF No. 94], 2021 U.S. Dist. LEXIS 254631 (W.D. Va. Aug. 26, 2021) (J. Cullen).

31.      In September 2022, a jury found that VDOC intentionally discriminated against Flores because of her sex, menstruation, or use of a tampon in violation of Title VII and returned a verdict in her favor. *See Id.* [ECF No. 184].

32.    In September 2023, the Court denied VODC's motion for a judgment as a matter of law and entered judgment in favor of Flores. *See Id.* [ECF No. 208 and 209], 2023 U.S. Dist. LEXIS 172884, 2023 WL 6304680 (W.D. Va. Sept. 27, 2023) (J. Dillon).

**V.  Plaintiff Mallory Patterson's job was threatened, and she was subjected to a strip search because she was menstruating and utilized a menstrual cup.**

33.    In June 2021, Patterson began work as a Therapeutic Community Counselor at VDOC's Indian Creek Correctional Center ("ICCC") in Chesapeake, Virginia.

34.    Patterson was hired through a contractor company, Spectrum Health Systems, Inc., but the terms and conditions of her employment were controlled by VDOC. Patterson was subject to VDOC's training and policies. Patterson was assigned a VDOC email account. Patterson worked on-site at VDOC's ICCC facility alongside VDOC employees. Finally, VDOC had the authority to terminate Patterson's employment at ICCC. As such, VDOC was Patterson's joint employer within the meaning of Title VII.

35.    On November 10, 2021, Patterson arrived at work and went through the body scanner system as normal. She went through the body scanner, collected her items, and began making her way through two locked doors and two of three locked gates. When she got to the third gate, it would not open.

36.    A VDOC officer came out and informed Patterson that she had to go back to the body scanner.

37.    Patterson returned to the "shakedown" area where she was instructed to wait for an "investigator" to arrive. Patterson waited for over an hour in the "shakedown" area where her colleagues arriving at work could see her and see that she was being detained. At some point, Patterson's colleague arrived and waited with her.

38.     At approximately 8:30am, Patterson was approached by VDOC investigator Sgt. P. Allen and VDOC Lt. Allen. Lt. Allen told Patterson that her body scan image was flagged as suspicious and asked Patterson "do you have anything (contraband) on you?"

39.     Patterson replied she didn't have anything on her. She then told VDOC that she was currently menstruating and that was wearing a menstrual cup. Sgt. P. Allen replied that she would let VDOC Major Lassiter know and "see where she wants to go from there."

40.     At approximately 9:00am, Major Lassiter came to speak with Patterson and said "you cannot clear the scanner, so you cannot enter the [facility]. I hear you wear a Divia Cup?" Patterson replied that she did. Major Lassiter said, "Okay, well regardless, you cannot pass the body scanner. So, you have two options: comply with a strip search or leave and be separated from employment, pending potential criminal charges."

41.     At which point, Patterson experienced extreme emotional distress and became hysterical at that point. Patterson and her colleague stepped outside as Patterson tried to collect herself. Patterson's colleague advised that if she did not comply with the strip search, she could not work at ICCC anymore.

42.     Patterson then collected herself and went back into the facility. She felt like she had to comply with the strip search to keep her job, prove her innocence, and avoid criminal charges.

43.     Patterson signed the strip search consent form. Patterson was crying and Major Lassiter said, "This happens to some staff every year and each one of them feels just like you do right now."

44.     Major Lassiter and two other VDOC officers (Officer Porter and Officer Sessomes) took Patterson into the bathroom and proceeded to instruct her to take every piece of clothing off until she was standing barefoot and completely naked on the dirty bathroom floor. Patterson was

then instructed to remove and show her menstrual cup to the officers, which she did. Patterson was crying the entire time.

45.     Patterson was not permitted to reinsert her menstrual cup until she cleared the body scanner. She took her menstrual cup to her vehicle in the parking lot, reentered the facility, and had to go back through the body scanner. Her entire body was trembling.

46.     Patterson cleared the scanner and went home because she was too distraught to be at work that day.

47.     At no point did Patterson bring or attempt to bring contraband into ICCC.

48.     Instead, she was threatened with termination from employment and subjected to a strip search because she was a menstruating female utilizing a feminine hygiene product when she went to work November 10, 2021.

49.     On information and belief, no male employee has been threatened with termination and subjected to a strip search due to menstruation or utilizing a female hygiene product.

50.     Ultimately, Patterson felt she could not continue to work in the environment at ICCC due to this experience and resigned her employment effective in December 2021.

**VI.  Plaintiff Emily Comer was terminated from employment because she utilized an IUD**

51.     In April 2020, Comer began work as a Licensed Practical Nurse ("LPN") at VDOC's State Farm Correctional Center ("SFCC") in Goochland County, Virginia.

52.     Comer was placed at SFCC by a staffing company, HealthForce of Virginia, Inc., but the terms and conditions of her employment were controlled by VDOC. VDOC provided the tools, equipment, and place to perform the job. Comer's direct supervisor was a VDOC employee. Comer's schedule was set by VDOC. Comer was subject to VDOC's training and policies.

Comer's employment at SFCC was terminated at the direction of VDOC. As such, VDOC was Comer's joint employer within the meaning of Title VII.

53.    During Comer's tenure with VDOC, she was successful in her job and met VDOC's legitimate employment expectations.

54.    On April 4, 2022, Comer arrived at work and went through the body scanner system as normal. The VDOC officer operating the body scanner then stopped Comer and asked if she was on her period because the officer "saw something" on her scan.

55.    Comer replied that she was not currently menstruating, but she was utilizing an intrauterine device ("IUD") as she had done throughout her employment.

56.    Comer was allowed to proceed to her work area and worked a normal day.

57.    The next day, April 5, 2022, Comer passed through the body scanner without incident and worked a normal shift.

58.    Comer was scheduled to be off work on April 6th and return to work on April 7th. However, at approximately 5:00pm on April 6th, she received a voice-mail message from an employee at the staffing company advising her that her shift the following day had been cancelled.

59.    On April 7, 2022, Comer messaged with her VDOC supervisor, Jessica Rivera, who informed her that, at the direction of the Warden of SFCC she was "not allowed back into the facility due to suspicious body scans." She additionally spoke with the staffing agency and they confirmed that they had been informed by VDOC that her employment at SFCC had terminated due to "suspicious body scans."

60.    At no point did Comer bring or attempt to bring contraband into SFCC.

61.    Instead, Comer's employment was terminated because she was a female utilizing a contraceptive device when she arrived to work on April 4, 2022.

11

62.     On information and belief, no male employee has been terminated due to utilization of a contraceptive device.

**VII.  Plaintiff Carla McDowney's job was threatened, and she was subjected to a strip search because she was menstruating and utilized a tampon.**

63.     In August 2023, McDowney began work as an officer in training at VDOC's Haynesville Correctional Center ("HCC") in Richmond County, Virginia. McDowney is directly employed by VDOC. The training work is conducted at the front of the HCC facility, not in the secured section of the facility. Therefore, McDowney does not process through the body scanner system on a typical workday.

64.     On October 27, 2023, while at work at HCC, Sgt. Bates informed McDowney that she and several other officers in training would be going into the secured section of the facility to watch inmates graduate.

65.     McDowney went through the body scanner security check as instructed. The VDOC officer operating the body scanner system then stopped her and called her back to the scanner.

66.     Without telling McDowney what was happening, the officer pulled out a chair and instructed her to wait.

67.     After approximately 20 minutes, the officer instructed McDowney to go sit in the lobby, where McDowney waited for another 20 minutes while a different officer watched over her.

68.     Next, the Warden of HCC called McDowney into the conference room, where he was accompanied by several other VDOC employees.

69.     The Warden asked McDowney "what is in your vagina?" McDowney initially responded, "nothing, why?" The Warden continued speaking and said, "the scanner picked up something in your vagina." McDowney then remembered that she was menstruating and had a

12

tampon placed in her vagina and a sanitary pad in her underwear. McDowney told the Warden that she had a tampon in and sanitary paid in her underwear.

70.    The Warden replied, "if that is it, do you give consent to us doing a strip search?" McDowney asked "and if I don't?" The Warden replied then "you don't have a job." McDowney was so upset that she began to cry.

71.    McDowney then consented to the strip search. However, she felt like she had no option but to comply with the strip search or she would lose her job.

72.    Next, two VDOC officers took McDowney into the bathroom and instructed her to remove her clothing. McDowney was so upset, she started to take off her clothes and then stopped several times while crying hysterically.

73.    McDowney collected herself and removed all of her clothing. The VDOC officers searched each clothing item as she removed them until she was standing barefoot and completely naked on the dirty bathroom floor.

74.    She was then instructed to remove her tampon and sanitary pad, which she did.

75.    McDowney took paper towels and folded them to make a temporary pad and then one of the VDOC officers handed her a sanitary pad.

76.    After McDowney re-dressed and went back into the conference room she asked the Warden "if I go through this machine again next month and I am on my period again, am I going to have to go through something like this again?" The Warden shrugged his shoulders and made a facial expression that indicated "maybe." The Warden told McDowney he could tell she was upset and allowed her to go home for the day.

77.    At no point did McDowney bring or attempt to bring contraband into HCC.

78.    Instead, she was threatened with termination from employment and subjected to a strip search because she was a menstruating female utilizing a feminine hygiene product when she went to work October 27, 2023.

79.    On information and belief, no male employee has been threatened with termination or subjected to a strip search due to menstruation or utilizing a female hygiene product.

80.    As of the date of this filing, McDowney remains a VDOC employee working at HCC.

## CLASS ACTION ALLEGATIONS

81.    Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of a class of all females[2] working at VDOC correctional centers equipped with body scanners at any time from June 25, 2021 up to the present that have been subjected to a strip search, had their employment threatened, or been terminated from employment at the correctional center because of their menstruation, use of feminine hygiene product, or use of a contraceptive device.

82.    Plaintiffs are members of the Class they seek to represent.

83.    The members of the Class identified herein are so numerous that joinder of all members is impracticable. VDOC has nearly 13,000 employees, the majority of which work daily at the approximately 50 VDOC correctional centers in the Commonwealth. On information and belief, approximately 46% of VDOC employees are female. On further information and belief, VDOC jointly employs over 1,000 additional employees placed at its correctional centers by staffing companies.

---

[2] Plaintiffs note that transgender men (individuals who were assigned female at birth and transitioned to living as men) and nonbinary individuals may also menstruate or use contraceptive devices. The use of the term "female" in the Class definition and throughout the Complaint is meant to encompass these employees as well.

84.    There are questions of law and fact common to the Class and these questions predominate over any questions that may affect only individual class members. Common questions include but are not limited to: whether VDOC knew its SOP(s) and practices discriminated against females, whether VDOC's SOP(s) and practices had a disparate impact on females, whether there are less discriminatory alternative policies and practices VDOC could adopt for employee screening and employment termination decisions.

85.    These common questions can be answered with common proof, including but not limited to: VDOC's SOP(s), VDOC's training on operating the body scanners, VDOC's inability to distinguish between contraband and feminine hygiene products and/or birth control devices, VDOC's contraband data, and investigative reports from strip searches and employment terminations that have occurred at VDOC correctional centers equipped with the body scanners.

86.    The Plaintiffs' claims are typical of the claims of the Class. Specifically, they all have been (i) subject to the same SOP(s), practices, and policies and (ii) subjected to a strip search because of a anomaly or unknown object on their body scan which arose from their menstruation, use of a feminine hygiene product, or use of a contraceptive device, or (iii) threatened with termination from employment because of a anomaly or unknown object on their body scan which arose from their menstruation, use of a feminine hygiene product, or use of a contraceptive device, and/or (iv) actually terminated from employment because of their menstruation, use of a feminine hygiene product, or use of a contraceptive device.

87.    The Plaintiffs will fairly and adequately represent and protect the interests of the members of the class because: (1) they are willing and able to represent the proposed Class, (2) their interests are not antagonistic to those of the other Class members, (3) they are represented by counsel experienced in litigating class actions in the field of employment discrimination.

88.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because VDOC acted pursuant to an SOP applicable to the Class, making declaratory and injunctive relief with respect to Plaintiffs, and the Class, appropriate. The Class members are entitled to injunctive relief to secure changes in VDOC's policies and practices regarding body scans, strip searches, threatened termination from employment and actual termination from employment.

89.    Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The Class members have been damaged and are entitled to recovery as a result of VDOC's common, uninform, and discriminatory policies and practices. Further, the Class members were subjected to the same VDOC-wide policy or practice of sex discrimination and requiring each class member to pursue her claim individually would result in needless duplication of proof and would waste the resources of both the parties and the Court.

**COUNT I**
**Employment Discrimination on the Basis of Sex**
**Systemic Disparate Treatment**
**Title VII of the Civil Rights Act**
**Against Defendant Virginia Department of Corrections**

90.    On behalf of themselves and the Class, Plaintiffs incorporate by reference the allegations set forth throughout the Complaint.

91.    VDOC adopted and/or maintained and implemented a Standard Operating Procedure ("SOP") and practice regarding the body scanners and strip searches of employees entering secured areas of its correctional centers.

92.    The SOP and practice permit VDOC to strip search employees when an anomaly or unknown object is detected on the body scan.

16

93.    The SOP and practice permit VDOC to terminate the employment of an employee when an anomaly or unknown object is detected in the body scan and/or the employee refuses to consent to a strip search.

94.    A tampon, menstrual cup, or birth control device utilized by an employee may generate an anomaly or unknown object on a body scan. VDOC has repeatedly stated it cannot tell the difference between these objects and contraband.

95.    But for Plaintiffs and Class members' sex, menstruation, use of a feminine hygiene product, or use of a contraceptive device, they would have been treated differently and not subjected to a strip search, their termination threatened and/or they were actually terminated from employment.

96.    Defendant knew the above described actions constituted sex discrimination, has demonstrated a discriminatory animus against females, and has refused to correct or remedy same.

97.    Defendant's actions have caused Plaintiffs and the Class to suffer injury including but not limited to mental anguish, pain, suffering, loss of wages and other job benefits, and litigation expenses including attorneys' fees and costs.

98.    On behalf of themselves and the Class, Plaintiffs request relief as provided in the Prayer for Relief below.

**COUNT II**
**Employment Discrimination on the Basis of Sex**
**Disparate Impact**
**Title VII of the Civil Rights Act**
**Against Defendant Virginia Department of Corrections**

99.    On behalf of themselves and the Class, Plaintiffs incorporate by reference the allegations set forth throughout the Complaint.

100.    VDOC adopted and/or maintained and implemented a Standard Operating Procedure ("SOP") and practice regarding the body scanners and strip searching of employees entering secured areas of its correctional centers.

101.    The SOP and practice permit VDOC to strip search employees when an anomaly or unknown object is detected on the body scan.

102.    The SOP and practice permit VDOC to terminate the employment of an employee when an anomaly or unknown object is detected in the body scan and/or the employee refuses to consent to a strip search.

103.    A tampon, menstrual cup, or birth control device utilized by an employee may generate an anomaly or unknown object on a body scan. VDOC has repeatedly stated it cannot tell the difference between these objects and contraband.

104.    Tampons, menstrual cups, and contraceptive devices are utilized by female employees.

105.    The policy and practice described above has had a disparate impact on female employees at VDOC and has altered the terms and conditions of their employment and/or resulted in adverse job actions such as termination from employment.

106.    The policy and practice are not isolated and has resulted in a series of incidents as experienced by Joyce Flores, Plaintiffs, and Class members.

107.    VDOC's discriminatory practices described herein have resulted in injury and damages including mental anguish, pain, suffering, loss of wages and other job benefits, and litigation expenses including attorneys' fees and costs for female employees.

108.    On behalf of themselves and the Class, Plaintiffs request relief as provided in the Prayer for Relief below.

**COUNT III**
**Employment Discrimination on the Basis of Sex**
**Systemic Hostile Work Environment**
**Title VII of the Civil Rights Act**
**Against Defendant Virginia Department of Corrections**

109.    On behalf of themselves and the Class, Plaintiffs incorporate by reference the allegations set forth throughout the Complaint.

110.    Defendant has subjected Plaintiffs and members of the Class to a hostile work environment because of sex, menstruation, use of feminine hygiene product, and/or use of birth control device.

111.    Defendant has forced Plaintiff s and members of the Class to submit to a strip search or be terminated from employment because of sex, menstruation, use of feminine hygiene product, and/or use of birth control device.

112.    Such actions were unwanted and were sufficiently severe and pervasive to alter the terms, conditions and privileges of employment for Plaintiffs and members of the Class.

113.    Such actions are imputable to VDOC as they were undertaken pursuant to VDOC Standard Operating Procedure and/or by decision makers with the authority to hire and fire employees.

114.    VDOC's discriminatory practices described herein have resulted in injury and damages including mental anguish, pain, suffering, loss of wages and other job benefits, and litigation expenses including attorneys' fees and costs for female employees.

115.    On behalf Plaintiffs and the Class, Plaintiffs requests relief as provided in the Prayer for Relief below.

**COUNT IV**
**Discrimination on the Basis of Sex**
**Violation of the Equal Protection Clause**
**Section 1983**
**Against Defendant Chadwick Dotson**

116.    On behalf of themselves and the Class, Plaintiffs incorporate by reference the allegations set forth throughout the Complaint.

117.    Plaintiffs and members of the Class are U.S. citizens entitled to enjoy the equal protection of the laws pursuant to Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

118.    Defendant Chadwick Dotson is the Director of VDOC and a person acting under the color of state law within the meaning of 42 U.S. § 1983.

119.    Defendant has maintained a policy and practice of subjecting female employees and/or contractors to strip searches and/or threats of and actual terminations from employment because they are female, menstruating, using a feminine hygiene product, or using a contraceptive device.

120.    But for Plaintiffs and Class members' sex, menstruation, use of a feminine hygiene product, or use of a birth control device, they would have been treated differently and not subjected to a strip search and/or termination from employment.

121.    Defendant knew the above described actions constituted sex discrimination, has demonstrated a discriminatory animus against females, and has refused to correct or remedy same.

122.    Defendant's actions have caused Plaintiffs and the Class to suffer injury. Such injury and damage is ongoing as Defendant has continued to operate pursuant to the SOP and policies and practices described herein.

123.    On behalf of themselves and the Class, Plaintiffs request prospective injunctive relief as provided in the Prayer for Relief below.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, request judgment pursuant to Title VII against Defendant Virginia Department of Corrections as follows:

A.    That this case be maintained and certified as a class action on behalf of the proposed Class, that Plaintiffs be designated as representatives of the Class, and that their counsel of record be designated as Class counsel;

B.    For appropriate declaratory relief declaring the acts and practices complained of herein in violation of Title VII;

C.    For an injunction prohibiting VDOC from engaging in the practices complained of herein and requiring the adoption of appropriate policies and practices consistent with VDOC legal obligations to operate a work environment free from employment discrimination and for the Court to retain jurisdiction over VDOC until such time as it is satisfied that it has remedied the practices complained of and is determined to be in full compliance with the law;

D.    For an award of back-pay damages with pre-judgment interest for Plaintiff Comer and members of the Class that were terminated from employment;

E,    For equitable relief including reinstatement or front pay in lieu of same for Plaintiff Comer and the members of the Class that were terminated or constructively discharged;

F.    For an award of compensatory damages to Plaintiffs and members of the Class;

G.    For an award of reasonable attorneys' fees and costs, including expert witness fees expended; and

H.    For such other and further relief to which Plaintiffs and the Class may be entitled.

WHEREFORE Plaintiffs on behalf of themselves and all others similarly situated, request judgment pursuant to Section 1983 against Defendant Chadwick Dotson, in his official capacity, as follows:

A.      That this case be maintained and certified as a class action on behalf of the proposed Class, that Plaintiffs be designated as representatives of the Class, and that their counsel of record be designated as Class counsel;

B.      For an injunction prohibiting Defendant Dotson from engaging in the practices complained of herein and requiring the adoption of appropriate policies and practices consistent with Defendant Dotson's legal obligations to not deny to any person within its jurisdiction the equal protection of the laws and for the Court to retain jurisdiction over VDOC until such time as it is satisfied that it has remedied the practices complained of and is determined to be in full compliance with the law; and

C.      For such other and further relief to which Plaintiffs and the Class may be entitled.

TRIAL BY JURY IS DEMANDED

Respectfully submitted,

MALLORY PATTERSON, EMILY COMER, AND CARLA MCDOWNEY on behalf of themselves and others similarly situated,

*/s/ Paul M. Falabella*_____
Harris D. Butler, III (VSB No. 26483)
Paul M. Falabella (VSB No. 81199)
Samantha Galina (VSB No. 96981)
Butler Curwood, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Telephone: (804) 648-4848
Facsimile: (804) 237-0413
Email: harris@butlercurwood.com

Email: paul@butlercurwood.com
Email: samantha@butlercurwood.com

*Counsel for Plaintiffs*