IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MALLORY PATTERSON,
EMILY COMER,
CARLA McDOWNEY,
    Plaintiffs,

v.
                                       Civil No. 3:23cv757 (DJN)

VIRGINIA DEPARTMENT OF CORRECTIONS,
CHADWICK DOTSON (in his official capacity),
    Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on Virginia Department of Corrections ("VDOC") and Director Chadwick Dotson's ("Director Dotson") Joint Motion to Dismiss (ECF No. 10). There, Defendants move to dismiss each of the four claims levied by Mallory Patterson, Emily Comer and Carla McDowney (collectively, "Plaintiffs") under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs bring this suit against Defendants[1] for gender discrimination that Plaintiffs experienced while employed by VDOC and request declaratory relief, equitable relief and an award of damages.[2] For the reasons that follow, the Court will GRANT IN PART and DENY IN PART Defendant's Motion to Dismiss, (ECF No. 10).

---

[1]    Director Dotson is sued only in his official capacity and Plaintiffs request only equitable relief from him.

[2]    Plaintiffs also move for class certification in the Complaint. (ECF No. 1 at 21 ("Compl.").) This Opinion should not be construed as adjudicating the merits of class certification, as the Court will direct the parties to brief the class certification issue in a forthcoming Order. As described herein, however, the Court dismisses Counts III and IV, both as to the individual and class claims.

## I.    BACKGROUND

Mallory Patterson ("Patterson"), Emily Comer ("Comer") and Carla McDowney ("McDowney") are three women who were employed by VDOC between 2020 and 2023.[3] (Complaint ¶¶ 7–9 ("Compl.").)  Like every VDOC employee working within a correctional center, Plaintiffs began their workdays by passing through a full-body security scanner that conducts an x-ray scan of their person.[4]  Such scanners are routinely used throughout VDOC's numerous correctional facilities, and VDOC's Standard Operating Procedure ("SOP") requires all individuals entering a correctional center equipped with body scanners to submit themselves to a body scan. (*Id.* ¶ 15.)  The SOP likewise states that when the body scanner detects an anomaly, like an object within the body, VDOC may strip search the individual. (*Id.* ¶ 16.)  The strip search requires becoming fully undressed in front of correctional officers while they inspect one's clothing, breasts, genitalia and buttocks. (*Id.* ¶¶ 44–46, 72–74.)  Refusing to consent to a strip search results in employment termination and potential criminal penalties. (*Id.* ¶¶ 42, 78.)

VDOC's body scanners, through which its employees pass daily, are not perfect. Relevant here, VDOC's body scanners are unable to distinguish between a tampon, menstrual cup or intrauterine device (IUD) and contraband, a fact that VDOC has recognized multiple times. (*Id.* ¶ 21.)  Simply put, female employees at VDOC risk being strip searched merely due

---

[3]     Patterson was employed from June 2021 until December 2021 at VDOC's Indian Creek Correctional Center.  Comer was employed from April 2020 until April 2022 at VDOC's State Farm Correctional Center.  McDowney was employed from August 2023 until November 2023. (Compl. ¶¶ 7–9.)  Patterson and Comer were both hired by staffing agencies, but because their work is entirely controlled by VDOC, they constitute employees of VDOC for purposes of Title VII. *Farlow v. Wachovia Bank of N. Carolina, N.A.*, 259 F.3d 309, 314 (4th Cir. 2001). Defendants do not object to Plaintiffs having characterized themselves as VDOC employees.

[4]     Plaintiff McDowney does not pass through body scanners on a daily basis, as her work is not conducted in the secured section of the facility. (*Id.* ¶ 63.)  Nevertheless, she must submit herself to a body scan when she enters the secure areas of VDOC facilities.

to their menstruation or for using a routine hormonal control and contraceptive device like an IUD. Thus, monthly, each of VDOC's roughly 6,000 female employees risk being subjected to a highly invasive strip search due to using female hygiene products or semi-permanent contraceptive and hormonal control devices, conditions inextricably linked to their sex. (*Id.* ¶ 83.)

Indeed, VDOC's SOP provides no guidance specifically tailored to the fact that women will be disproportionately affected by its security measures. In fact, VDOC's training has further exacerbated the effect that its body-scan policy has on women, as it has instructed its employees that "nothing should be inside of the lower cavity of any person," which presumably fails to consider the existence of tampons, pads, menstrual cups, IUDs and other sanitary items routinely used by its female employees. (*Id.* ¶ 24.) To be sure, VDOC's training materials do contain images of women with IUDs and tampons to inform body scan operators on the distinction between a tampon and contraband, but those images are of medical grade x-rays, which render images of a much higher resolution than the body scanners that VDOC deploys. (*Id.* ¶ 26.) VDOC has consistently described its body scanners as being unable to differentiate between female hygiene items and legitimate contraband. (*Id.* ¶ 21.) Thus, to the extent that VDOC has provided training tailored to the fact that something besides contraband may exist within a woman's body cavities when its scanners detect an anomaly, such training stands wholly irrelevant to the body scanners used by VDOC in its facilities. (*Id.*) Moreover, VDOC has advised its personnel that "most contraband will be concealed in the woman['s] internal body cavity." (*Id.* ¶ 24.) VDOC's training again fails to reflect reality, as its own data indicates that only nine percent of contraband detected by VDOC was found in a body cavity, let alone female body cavities. (*Id.* ¶ 25.)

3

The inability for VDOC's body scanners to distinguish between contraband and a tampon, and VDOC's failure to implement policies accounting for that, forms the basis of this suit. Each Plaintiff here experienced either a strip search or was fired, because they had a tampon, menstrual cup or IUD on their person. In other words, each Plaintiff — by virtue of a sex-based characteristic — was subject to discrimination actionable under our Nation's civil rights laws.

Plaintiff Patterson began working for VDOC in June of 2021 at VDOC's Indian Creek Correctional Center in Chesapeake, Virginia as a Therapeutic Community Counselor. (*Id.* ¶ 7.) No reported incidents of misconduct were reported during her tenure, and she apparently satisfied her employment obligations. On November 10, 2021, Patterson arrived at work and entered through the body scanner as she did every day. (*Id.* ¶ 35.) However, on that day, VDOC noticed an anomaly on Patterson's body scan and ordered her to wait until an investigator arrived, which took over an hour. (*Id.* ¶ 37.) Eventually, a sergeant and a lieutenant arrived and queried whether Patterson had contraband on her. (*Id.* ¶ 39.) She replied that she did not, but that she was currently menstruating and was using a menstrual cup. (*Id.*)

Sometime later, Major Lassiter arrived and informed Patterson that, because she could not clear the scanner, she could not enter the facility. Her options were to "comply with a strip search or leave and be separated from employment, pending potential criminal charges." (*Id.* ¶ 40.) At that point, faced with the Hobson's choice of an invasive strip search on account of her menstrual cycle, or employment termination and potential criminal charges, Patterson consented to a strip search overseen by two officers and Major Lassiter, an experience that caused her

significant emotional distress.[5] (*Id.* ¶ 44.) The officers instructed Patterson to remove the

menstrual cup and show it to them, but she was not permitted to reinsert it. (*Id.* ¶ 45.) She then

cleared the body scanner but left work, because the strip search rendered her too distraught to

work that day. (*Id.* ¶ 46.) She eventually resigned one month after this experience, as she was

left shaken and doubtful that she could continue working at that VDOC correctional facility with

the threat of monthly strip searches. (*Id.* ¶ 50.)

The second plaintiff is Plaintiff Comer. She began working for VDOC as a Licensed

Practical Nurse in April of 2020 as VDOC's State Farm Correctional Center located in

Goochland County, Virginia. (*Id.* ¶¶ 8, 51.) Like Plaintiff Patterson, Plaintiff Comer also

successfully undertook the duties and expectations of her employment. (*Id.* ¶ 53.) On April 4,

2022, Plaintiff Comer passed through the body scanner as she always did, but this time an officer

asked her whether she was menstruating, because the officer "saw something" on her scan. (*Id.*

¶ 54.) Plaintiff Comer replied that she was not, but that she had an IUD, a device routinely used

by women of almost all age groups to regulate hormones and prevent pregnancy.[6] (*Id.* ¶ 55.)

After disclosing that she used an IUD, Plaintiff Comer was allowed to enter the correctional

facility and worked a normal day.

Two days later, VDOC fired Plaintiff Comer. VDOC informed Plaintiff Comer that the

reason her employment was terminated was due to a series of "suspicious body scans." (*Id.*

¶ 59.) VDOC has not provided any evidence related to the "suspicious" scans that predicated

---

[5]     Major Lassiter, who helped conduct the strip search, is female. (*Id.* ¶ 39.) The gender of the other two officers, Officer Porter and Officer Sessomes, is unclear from the face of the Complaint. (*Id.* ¶ 44.)

[6]     *See* Carrie MacMillan, *Intrauterine Devices (IUDs): What Women Need to Know*, YALE MED. (Oct. 4, 2023), https://www.yalemedicine.org/news/intrauterine-devices-iud.

Plaintiff Comer's termination and has otherwise failed to provide further detail on Plaintiff

Comer's discharge.  Thus, only two days after a VDOC officer "saw something" — i.e., an IUD

— on Plaintiff Comer's body scan, she was discharged from her position.  (*Id.* ¶¶ 58, 59.)

Plaintiff McDowney, who began working for VDOC in August of 2023 at its Haynesville

Correctional Center in Richmond County, Virginia, constitutes the final plaintiff in this matter.

(*Id.* ¶¶ 65, 66.)  Unlike Plaintiffs Comer and Patterson, Plaintiff McDowney does not routinely

pass through body scanners, as her work is not conducted in the secured section of the facility.

(*Id.* ¶ 63.)  However, on October 27, 2023, she decided to attend an inmate graduation ceremony

along with her colleagues.  (*Id.*)  The ceremony was in a secure section of the facility, which

required Plaintiff McDowney to pass through VDOC's body scanners.  (*Id.* ¶¶ 64, 65.)  After

passing through the body scanner, she was instructed to stop and wait in a conference room

without being told why she was being sequestered.  (*Id.*)  Eventually, the Warden[7] arrived, and

he pointedly asked Plaintiff McDowney in front of multiple colleagues, "what is in your

vagina?"  (*Id.* ¶ 69.)  At first, she responded "nothing," but then remembered that she was

menstruating and had a tampon and sanitary pad in place.  (*Id.*)  The Warden replied, "if that is

it, do you give consent to us doing a strip search?"  (*Id.* ¶ 70.)  Plaintiff McDowney asked what

would occur if she did not consent, to which the Warden replied, "then you don't have a job."

(*Id.*)  Plaintiff McDowney began crying and ultimately consented to the strip search.  (*Id.*)

During the strip search, overseen by two VDOC officers,[8] she removed all clothing, and then was

instructed to remove her tampon and sanitary pad, which she did.  (*Id.* ¶¶ 73–75.)  Afterwards,

---

[7]      The Warden is a male.  (Compl. ¶ 68.)

[8]      The gender of the two officers overseeing Plaintiff McDowney's strip search is unclear
from the face of the Complaint.

she asked the Warden if she would be subject to a strip search next month, when she would next be menstruating. (*Id.* ¶ 76.) The Warden shrugged his shoulders and made a facial expression indicating "maybe." (*Id.*) Two weeks later, Plaintiff McDowney resigned.[9] (ECF No. 11 at 6 n.5.)

These Plaintiffs now bring Counts I, II and III against VDOC, requesting various forms of damages. Count I constitutes Plaintiffs' disparate treatment claim under Title VII of the 1964 Civil Rights Act. Count II constitutes a disparate impact claim, also pursuant to Title VII. In Count III, Plaintiffs forward a hostile work environment claim, likewise under Title VII.[10] Lastly, in Count IV, Plaintiffs bring a claim against Director Chadwick Dotson in his official capacity as Director of VDOC and requests equitable relief. The Court now addresses each of these counts in turn and considers each Plaintiff respectively therein.[11]

---

[9]     Plaintiff McDowney resigned on November 11, 2023, two days after the Complaint in this case was filed. (ECF No. 11 at 9 n.6.)

[10]     Plaintiff Comer does not assert an individual claim for hostile work environment in violation of title VII, because she was not strip searched. (ECF No. 12 at 14 n.3.)

[11]     Plaintiff Patterson and Comer have satisfied Title VII's exhaustion requirement and Defendant does not contend otherwise. (Compl. ¶ 6.) However, Plaintiff McDowney has not. Plaintiffs contend that Plaintiff McDowney's claim is properly joined to her co-Plaintiffs, because of the "single-filing rule." (*Id.* at 2 n.1.) This rule permits plaintiffs who have not exhausted their EEOC administrative requirements to be joined in a suit, "provided that all plaintiffs' claims are substantially similar and that the EEOC charge itself gave notice of the charge's collective nature." *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 293 (4th Cir. 2004). To be sure, the "single-filing rule" has not been explicitly adopted by the Fourth Circuit nor has it been applied in the nonclass context. However, it has been "long applied" in the Fourth Circuit in the context of class actions. *King v. McMillan*, 233 F. App'x. 242, 244 (4th Cir. 2007). But, at present, this case is a nonclass action, given that no class has been certified. In the absence of binding Fourth Circuit precedent, the Court considers its sister circuits who routinely apply the single-filing rule under such circumstances. *See Barkhorn v. Ports Am. Chesapeake, LLC*, No. CIV. JKB-10-750, 2011 WL 4479694, at *4 (D. Md. Sept. 26, 2011) (collecting cases). Thus, the Court holds that Plaintiff McDowney's claim is properly before the Court due to the "single-filing rule." Defendants have likewise failed to object to or brief this issue, further supporting the Court's conclusion that the "single-filing rule" applies here. *See Ruddy v.*

## II.   STANDARD OF REVIEW

At this stage, the Court accepts as true the facts set forth in the Complaint, (ECF No. 1).

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss, the Court views

the facts in the light most favorable to the plaintiff.  *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130,

1134 (4th Cir. 1993).  Although the law does not require "detailed factual allegations . . .

[f]actual allegations must be enough to raise a right to relief above the speculative level,"

rendering the claim "plausible on its face" rather than merely "conceivable."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007).  At this juncture, Rule 8 of the Federal Rules of Civil

Procedure requires only that Plaintiffs proffer a short and plain statement showing that they are

entitled to relief under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000, *et seq.*, and the

Equal Protection Clause of the Fourteenth Amendment, as made actionable by 42 U.S.C. § 1983.

Moreover, in the employment discrimination context, Plaintiffs need not plead facts

demonstrating that a non-discriminatory reason for terminating their employment was pretextual,

as that determination is to be made at the summary judgment stage.  *Ray v. Amelia County*

*Sheriff's Office*, 302 F. App'x 209, 211 (4th Cir. 2008); *Moore v. Mukasey*, 305 F. App'x 111,

114 (4th Cir. 2008).

## III.   DISCUSSION

### A. Count I — Systemic Disparate Treatment in Violation of Title VII

One aspect of Title VII protects those in a protected class from overt discrimination,

known as disparate treatment discrimination.  Plaintiffs have two available paths to establish

liability under Title VII for this type of claim:  (1) "demonstrate through direct or circumstantial

---

*Bluestream Prof'l Serv., LLC*, 444 F.Supp. 3d 697, 714 n.34 (E.D. Va. 2020) (Ellis, J.) ("failure
to respond" to an argument permits a court to treat that argument as conceded).

evidence that [gender] was a motivating factor in the employer's adverse employment action"; or (2) use the burden-shifting scheme in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017). Here, Plaintiffs omit argument related to the *McDonnell Douglas* burden-shifting analysis, and the Court therefore proceeds by assuming that they are unable to demonstrate disparate treatment through that approach.[12] Plaintiffs, moreover, do not provide direct evidence of sex discrimination.

Thus, to demonstrate discrimination absent direct evidence thereof at this stage, a plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse action occurred "under circumstances giving rise to an inference of unlawful discrimination." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011). The parties omitted briefing on prongs one and two, and the Court therefore deems them conceded. Thus, the Court reviews only prongs three and four. The Court begins by considering what constitutes an "adverse employment action" in this context, as only one of the three Plaintiffs experienced a *per se* adverse employment action — termination — while the other two merely resigned after being threatened with termination had they refused to consent to a strip search.

---

[12] The Western District of Virginia, in *Flores v. Virginia Department of Corrections*, 2021 WL 668802 (W.D. Va. Feb 22, 2021), took a similar approach. There, the plaintiff — who had experienced harms almost identical to those here — noted that she was not bringing a comparator claim, as is required by *McDonnell Douglas*, because there is no relevant male comparator group when the baseline group consists of menstruating women. As such, the Western District of Virginia did not conduct a *McDonnell Douglas* burden shifting analysis. So too here.

### 1. Adverse Employment Actions Under Title VII

A Title VII claim requires that a plaintiff experience an adverse employment action. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007). Termination constitutes the typical adverse employment action predicating a Title VII claim. However, actions short of termination can constitute an adverse employment action in a Title VII claim for disparate treatment, the type of claim that Plaintiffs bring in Count I, under certain circumstances. To rise to the level of an adverse employment action absent termination, the misconduct must be more than something that offends the employee, and instead must materially alter "the terms, conditions, or benefits" of the plaintiff's employment. *Von Gunten v. Maryland*, 2434 F.3d 858, 865 (4th Cir. 2001). "In making this determination, context matters." *Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566, 575 (4th Cir. 2023).

Defendants concede that Plaintiff Comer, who was fired, experienced an adverse employment action. (ECF No. 11 at 5.) However, they contend that Plaintiffs Patterson and McDowney, who resigned from their positions, did not experience such an action, and therefore fail to bring claims cognizable under Title VII. (*Id.*) Plaintiffs note that while they may not have been fired, and thus have not pled an adverse employment action *per se*, they nevertheless experienced an adverse employment action. (ECF No. 12 at 13.) Specifically, they argue that VDOC committed an adverse employment action by threatening to terminate Plaintiffs Patterson and McDowney under the circumstances described herein and suggesting to Plaintiff Patterson that she may be subject to criminal charges. (*Id.* at 12.)

### a.    Relevant Fourth Circuit Adverse Employment Action Precedent

The Fourth Circuit has held that "[a]n adverse employment action is a discriminatory act that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment."

10

*Holland*, 487 F.3d at 219. When the alleged adverse employment action falls short of termination, "there still must be a tangible effect on the terms and conditions of employment." *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 737 n.6 (D. Md. 2009). Plaintiffs contend that the humiliation that they experienced due to the strip search and the prospect of continued strip searches on a monthly basis constitute an event severe enough to establish an adverse employment action. (ECF No. 12 at 13–14.) Plaintiffs likewise note that Plaintiff Comer was fired due to having a series of suspicious body scans, indicating that the more often VDOC's employees' body scans are flagged for an anomaly, the more likely they are to be terminated. (Compl. ¶ 59.) Defendants argue that the mere threat of termination cannot be considered an adverse employment action, as it does not cause a "significant change in employment status." (ECF No. 11 at 8 (citing *Swaso*, 698 F. App'x at 748).)

The threat of termination, standing alone, does not constitute an adverse employment action in the Fourth Circuit. For instance, in *Noonan*, the Fourth Circuit found that a supervisor inaccurately telling an employee that knowing their co-worker's pay was a fireable offense, thus implicitly threatening to fire that employee if they found out their co-workers pay, was not an adverse employment action. 84 F.3d at 574–75. The District of Maryland has likewise found that a letter reprimanding the plaintiff for failing to do his job duties, which included the threat of termination if future violations occurred, did not amount to an adverse employment action. *Nam v. 2012 Inc.*, 2016 WL 107198, at *6 (D. Md. Jan. 11, 2016); *see also Staggers v. Beccera*, 2021 WL 5989212, at *19 (D. Md. Dec. 17, 2021) (finding that referral to an employee improvement plan did not constitute an adverse action).

However, where the threat of termination is coupled with an aggravating factor, the Fourth Circuit has found that such conduct may constitute an adverse employment action.

11

In *Noonan*, the Fourth Circuit — in the context of a retaliation claim — noted that "special circumstances . . . such as a unique interpersonal . . . relationship between the supervisor and employee" could render an "unrealized threat of termination" sufficiently adverse to be actionable under Title VII. 84 F.4th at 575 (citing *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005)); *see also Moore v. Pegasus Steel, LLC*, 2024 WL 277779, at *2 (D.S.C. Jan. 25, 2024) (finding that being presented with inaccurate disciplinary forms, and being asked to sign or risk termination, constituted an adverse employment actions). The *Noonan* Court likewise noted that mitigating circumstances or conduct, like apologizing to the employee for the unrealized threat, supporting them in its aftermath and attempting to assuage further concerns, could render an otherwise adverse action insufficient. *Id.*

Moreover, where alleged misconduct or reprimands based on one's status in a protected class portends a greater likelihood of adverse employment actions in the future, like demotion or termination, then that increased likelihood itself constitutes an adverse employment action. *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015); *see also Barnes v. Charles Ct. Pub. Schs.*, 747 F. App'x 115, 119 (4th Cir. 2018) (holding that "a letter of warning did amount to an adverse action, because [plaintiff's supervisor] warned [plaintiff] that future disciplinary actions could result in further discipline, including termination"); *Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir. 2005) (reprimand rises to the level of an adverse employment action "if it affects the likelihood that the plaintiff will be terminated [or] undermines the plaintiff's current position"); *Koenic v. McHugh*, 2012 WL 1021849, at *5 (W.D. Va. March 26, 2012) (same). Indeed, this Court has recently concluded that Fourth Circuit precedent recognizes that even a verbal warning constitutes an adverse employment action when, under the employer's standard operating practices and procedure, it "will exacerbate future

12

discipline in a way that plausibly can be expected to create a future adverse employment effect."

*Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 821 (E.D. Va. 2016). If reprimands are

"signposts on a . . . path to a true adverse employment action," then Title VII forbids such

conduct. *Ann Arundel Cnty. Pub. Schs.*, 789 F.3d at 429.

 Courts in this District have likewise recognized that the context of one's employment can

affect Title VII's adverse employment action analysis. For instance, "certain occupations —

e.g., fireman, policeman, CIA operations officer — carry a degree and type of risk quite unlike

that found in the more commonplace work environments." *Peary v. Goss*, 365 F. Supp. 2d 713,

724 (E.D. Va. 2005), *aff'd*, 180 F. App'x 476 (4th Cir. 2006); *see also O'Neal v. City of

Chicago*, 392 F.3d 909, 912–13 (7th Cir. 2004) (transferring police officer from administrative

duty to beat duty does not constitute an adverse employment action). Similar considerations are

implicated by the instant matter, as each Plaintiff signed up for a job that may subject them to

lesser expectations of privacy.

 That being said, this Court has already permitted Title VII claims to pass even the more

stringent summary judgment standard when they were predicated on an allegedly discriminatory

strip search of a VDOC employee. *Blackshear v. Va. Dep't of Corr.*, 2021 WL 10564731 (E.D.

Va. July 7, 2021). In that case, a black supervisor was strip searched after passing through

security without a shakedown, but his colleagues were "surprised that [he] had been strip

searched . . . because they had never had to do such a thing to a supervisor." *Id.* at *4. Because

the black supervisor had made complaints about his own supervisor — the individual that that

ordered the strip search — the Court found he had "presented sufficient factual disputes to

preclude summary judgment as to whether" the strip search was a result of retaliation. *Id.* at *11;

*accord Nchotebah v. UTMB Corr. Managed Care*, 2020 WL 7053264, at *7 (E.D. Tex. Sept. 10,

2020) (Title VII disparate impact claim surviving motion to dismiss, because, in part, black employee was subject to "harassment and discrimination" stemming from a strip search).

To be sure, much of the referenced case law stems from cases involving Title VII's protection from retaliation, 42 U.S.C. § 2000e–3, rather than its substantive discrimination provisions, 42 U.S.C. §2000e–2, which are those relevant to Counts I and II. Defendants point out as much, indicating that the Supreme Court acknowledged this distinction in *Burlington Northern*, 548 U.S. 53 (2006) and created a higher bar for substantive discrimination claims. (ECF No. 13 at 6–7.) However, when the Supreme Court reviewed the distinction between Title VII's retaliation and substantive discrimination provisions, it merely noted that in the retaliation context, courts must consider harm caused *outside* the workplace, as well as within it. 548 U.S. 53 at 63. Were it otherwise, the anti-retaliation provision's "primary purpose" would be thwarted. *Id.* at 64. The Supreme Court did not say that, when the only relevant conduct stems from harassment inside the workplace, anti-retaliation and substantive discrimination cannot inform one another's respective analyses.

Accordingly, precedent related to an adverse employment action in the retaliation context can inform what constitutes an adverse employment action in the context of disparate treatment and disparate impact. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 n.2 (4th Cir. 2004) ("In the absence of strong contrary policy considerations, conformity between the provisions of Title VII is to be preferred."). To be sure, some anti-retaliation law will fail to map onto an anti-discrimination claim like that before the Court, either due to factual distinctions related to the workplace misconduct or due to the anti-retaliation case law considering conduct occurring outside of the workplace. However, when anti-retaliation precedent and principles can be mapped onto an anti-discrimination claim like those presented by Plaintiffs, the Court heeds

14

those principles. If it were otherwise, the Court would risk rejecting Plaintiffs' claims not due to their merits, but due to the uniqueness of their context.

Various principles emerge from the case law reviewed. The touchstone of an adverse employment action requires a showing that the alleged discrimination materially altered the terms, conditions or benefits of one's employment. *Holland*, 487 F.3d at 219. The threat of discharge can meet this standard, provided that some aggravating factor is present. For instance, where a gross power imbalance exists or where the employer effectuates the threat in an egregious manner and fails to mitigate, the misconduct can be considered when determining whether such conduct constitutes an adverse employment action. *Noonan*, 84 F.4th at 575. In particular, where a threat or reprimand increases the likelihood of a future adverse employment action, the threat or reprimand itself constitutes an adverse employment action. *Barnes*, 747 F. App'x at 119. Moreover, this Court has declined to take a one-size-fits-all approach between occupations, as it has recognized that certain occupations carry certain risks, and that those risks must be considered when reviewing claims like Plaintiffs'. *Peary*, 365 F. Supp. 2d at 724. Most relevant here, this Court has already permitted a Title VII retaliation claim to survive summary judgment when it was based, in part, on an allegedly discriminatory strip search. *Blackshear*, 2021 WL 10564731, at *11.

> **b.** **Relevant Adverse Employment Action Precedent Outside of the Fourth Circuit**

Given that Plaintiffs predicate their adverse employment action claim on the threat of termination, a theory infrequently asserted, the Court finds it prudent to likewise review relevant precedent outside of the Fourth Circuit's borders. When looking abroad, the Court perceives patterns that echo many of those in the Fourth Circuit. Namely, that the threat of termination can

amount to an adverse employment action provided that aggravating circumstances are present or that it affects an employee's future job prospects with the employer.

Other circuits regularly consider the existence of special circumstances in the context of an unrealized threat of discharge. For instance, if there exists a "unique interpersonal or educational relationship between the supervisor and employee, an unrealized threat of termination may constitute an adverse employment action." *Dick*, 397 F.3d at 1268; *see also Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1029 (7th Cir. 2004) (noting that "other indices that might be unique to a particular situation" can help establish an adverse employment action). Another factor indicative of an adverse employment is when "the record indicate[s] that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction." *Roberts v. Roadway Express*, 149 F.3d 1098, 1104 (10th Cir. 1998); *see also Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (finding no adverse employment action, because threats did not affect plaintiff's career prospects); *Billings v. Town of Grafton*, 515 F.3d 39, 54–55 (1st Cir. 2008) (concluding that a written reprimand amounted to adverse action when the reprimand included a threat of future discipline). The consensus of circuits likewise notes "that unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII." *Hottenroth*, 388 F.3d at 1015; *Rollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) (the threat of possible discharge standing alone was not an adverse employment action); *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000) (holding that criticism, oral threats, abusive remarks and threats of termination did not rise to the level of adverse employment action).

###### c.      Plaintiffs McDowney and Patterson Experienced Adverse Employment Actions

Plaintiffs McDowney and Patterson experienced essentially the same type of conduct — the option to consent to a strip search or be fired, as a result of menstruating — which they suggest amounts to an adverse employment action, and thus the Court reviews them in tandem.[13] Here, Plaintiffs have made out a plausible claim for an adverse employment action at this stage. The Court bases this determination on two separate grounds, which it reviews below.

First, Plaintiffs experienced an adverse employment action, because the presence of an "anomalous body scan," which would occur monthly, makes it more likely that they would be terminated in the future. *See Ann Arundel Cnty. Pub. Schools.*, 789 F.3d at 429 (finding that employer actions that are "signposts on a . . . path to a true adverse employment action" violate Title VII). As demonstrated by Plaintiff Comer, who was fired for a having a history of "suspicious body scans," a greater incidence of suspicious body scans increases the likelihood of discharge. (Compl. ¶ 59.) Plaintiffs rightly note that conduct having even an "indirect impact on an individual's employment" can constitute an adverse employment action, as is the case here. (ECF No. 12 at 13.) VDOC's failure to consider that menstruating females may have suspicious body scans more often, and the lack of policy tailored to that reality, renders the threat of termination and subsequently elevated likelihood of discharge an adverse employment action.

In *Barnes*, the Fourth Circuit held that a letter of warning constituted an adverse employment action under Title VII, because it warned that future disciplinary actions could result in termination. 747 F. App'x at 119. And in *Koenig*, the Western District of Virginia determined at the motion to dismiss stage that a written reprimand portending an increased

---

[13]      The only relevant distinction is that Plaintiff Patterson was threatened with criminal penalties, in addition to termination, if she did not consent to the strip search.

likelihood of termination constituted an adverse employment action. 2012 WL 1021849, at *5. The same conduct has occurred here. When Plaintiffs Patterson and McDowney passed through the body scanner, they were stopped due to having an "anomalous" body scan. (Compl. ¶¶ 40, 69.) Evidently, based on the termination of their co-Plaintiff Comer for a series of suspicious scans, the Court may plausibly infer that a series of anomalous body scans leads to discharge. (*Id.* ¶ 59.) As described *supra*, when a reprimand — like being forced to consent to a strip search — occurs, and that reprimand increases the likelihood of future termination, such conduct can constitute an adverse employment action. *See Hinton*, 185 F. Supp. 3d at 810 (finding an adverse employment action when a verbal warning "will exacerbate future discipline in a way that plausibly can be expected to create a future adverse employment effect"); *Koenig*, 2012 WL 1021849, at *5 (employer action "subject[ing] [plaintiff] to more serious discipline than she would have otherwise faced" constitutes an adverse employment action at the motion to dismiss stage).

Second, the circumstances of Plaintiff Patterson's, but not Plaintiff McDowney's, strip search and the inevitability of future strip searches constitute another ground for finding an adverse employment action occurred, as that materially altered a term and condition of Plaintiff Patterson's employment. Namely, that in order to do her job, she may be forced to consent to strip searches on a quarter of workdays lest she risk termination, criminal penalties and the embarrassment and distress attendant to such searches. The Court can plausibly infer that, based on Plaintiff Patterson's reaction to the request to be strip searched and her subsequent resignation, that female employees — even those who must pass through body scanners each day — are not informed by VDOC that the use of female hygiene products while menstruating would require being strip searched. Of course, Plaintiff Patterson eventually learned about this

term when VDOC ultimately presented her with the Hobbesian choice of either consenting to a strip search or losing her job and being subject to criminal penalties. Crucially, not only was that choice given to her on the date alleged in the Complaint, but the Court can plausibly infer that was also bound to happen every month, on one-fourth of working days, moving forward.

Plaintiff McDowney, by contrast, did not experience a material alteration of a term or condition of her employment, as she was not required to pass through VDOC's body scanners on a typical workday. (Compl. ¶ 63.) Rather, she elected to do so on the date alleged in the Complaint, but the terms of her employment did not regularly require her to do so. Accordingly, unlike Plaintiff Patterson, she does not face the specter of being subject to invasive strip searches on 25 percent of workdays moving forward. As such, the terms and conditions of her employment remained unchanged, despite being subject to a strip search on the date alleged. Nonetheless, the Court maintains its conclusion that Plaintiff McDowney did experience an adverse employment action, because the presence of an anomalous body scan, which would occur during each menstruation cycle, increases the likelihood that VDOC will terminate her employment, as noted *supra*. To be sure, VDOC informs its employees that if its body scanners detect an anomaly inside a person's body cavity, which presumably relates to contraband, it may strip search them. (ECF No. 11 at 1.) However, VDOC's employees may fairly assume that female hygiene products — items that are decidedly not contraband — fall outside the ambit of that policy. Thus, a strip search, and the specter of being subjected to strip searches on up to 25 percent of working days moving forward, constitutes a material alteration of a condition of Plaintiff Patterson's employment — she received no advance notice that such a series of events may occur purely on account of her being a menstruating female.

19

Moreover, it would be paradoxical for Plaintiff Patterson to have a claim under Title VII *only* if she refused to consent to the strip search and accept termination. Had she refused to consent to the strip search, she would have been fired, and the preceding discussion about whether she experienced an adverse employment action would be unnecessary as termination constitutes a *per se* adverse employment action. Thus, when a female employee must choose between a strip search or termination and potential criminal penalties, because her female hygiene products constituted an anomaly on a body scan, the strip search and threats reach the level of an adverse employment actionable under Title VII. That choice, absent advance notice, is no choice at all. Title VII's protections cannot turn on whether, in the heat of such a decision, one decides to accept resignation and potential criminal prosecution or be strip searched.

The Fourth Circuit has likewise recognized that courts must consider whether defendants took mitigating steps and must account for the context of the adverse employment action under review. Here, Defendant took no mitigating steps to render their body scan policy less adverse to its female employees. There exists no protocol in place catered to menstruating women, who will apparently trigger the body scanner 25 percent of the time due to using female hygiene products. For instance, VDOC's employees did not provide alternatives to a strip search when they confronted Plaintiffs Patterson and McDowney, like permitting them to use a pad instead of a tampon or menstrual cup and re-enter the body scanner to determine if an anomaly still exists. While the context of a jail may permit a greater degree of intrusiveness, VDOC's complete failure to account for the reality that its female employees will be subject to strip searches on a regular basis due to using female hygiene products renders that consideration moot. Plaintiffs McDowney and Patterson experienced an adverse employment action cognizable under Title VII.

20

### 2. Discrimination on the Basis of Sex

The second aspect of a disparate treatment claim centers on causation and requires that Plaintiffs make a plausible showing that the adverse employment action occurred because of their sex. Here, Plaintiffs must plead facts that give "rise to an inference" of sex-based discrimination. *Adams*, 640 F.3d at 558. Recently, the Supreme Court has expanded Title VII's protections to include more than just sex itself, but also those traits that are a function of sex. *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1741 (2020). Such traits include child-bearing capacity and other indicia that are inextricably intertwined with one's sex. *Hall v. Nalco Co.*, 534 F.3d 644, 644 (7th Cir. 2008). Moreover, under facts nearly identical to those here, the Western District of Virginia concluded that when VDOC predicated an adverse employment action on "menstruation and the use of a tampon," it did so on the basis of sex. *Flores*, 2021 WL 668802, at *6. A jury ultimately concluded the same.[14] *Flores v. Virginia Department of Corrections*, 2023 WL 6304680, at *2 (W.D. Va. Sept. 27, 2023) .

Defendants contend that Plaintiffs have not established a plausible connection between the threat of termination and the specter of future strip searching and their sex. (ECF No. 11 at 11.) Defendant's primary argument is that Plaintiffs' suspicious body scans do not implicate gender whatsoever, as Plaintiffs were searched or terminated for a completely gender-neutral reason — the presence of an "anomaly." (*Id.* at 12.)

Based on the facts being taken as true, as is required at this stage, Plaintiffs have plausibly described circumstantial evidence giving rise to an inference of sex discrimination.

---

[14]    VDOC displays a level of intransigence that is incomprehensible to this Court. It lost at trial in 2022 on a disparate-treatment claim in the Western District of Virginia under facts substantially identical to those here yet it continues to maintain what appears to be the exact same body scanner policy and training that jurors determined violated our Nation's civil rights laws.

21

First, Plaintiffs McDowney and Patterson both presented evidence to VDOC that they were on their period, yet were nevertheless threatened with termination and criminal penalties, in addition to the potential for more strip searches on account of their menstrual cycle every month moving forward. That series of events constitutes an adverse employment action, as described above, and would not have occurred had they not been menstruating women. In other words, but-for Plaintiff McDowney's and Patterson's sex, they would not have experienced the reprimand or conduct that they did, nor would they be subject to the inevitability of future strip searches. *See Flores*, 2021 WL 668802, at *6 (finding discrimination on the basis of sex after concluding that, but-for the use of a tampon while menstruating, a female employee would not have experienced an adverse employment action). Had Plaintiffs been men, they could easily avoid future strip searches by not having something inside their internal body cavity, as men have no justification for such an anomaly. However, Plaintiffs' status as menstruating women often necessarily implicates inserting either a tampon or menstrual cup on a monthly basis, an "anomaly" that, according to VDOC SOP, authorizes strip searches and raises the likelihood of being fired. The Supreme Court has put it thusly: "If changing the employee's sex would have yielded a different choice for the employer — a statutory violation has occurred . . . a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision." *Bostock*, 140 S.Ct. at 1741, 1743. Such has occurred here, particularly when taking the facts in the light most favorable to Plaintiffs.

Next, Plaintiff Comer has likewise sufficiently pled facts giving rise to an inference that gender discrimination caused her discharge. As noted, she was fired only two days after being flagged for a suspicious body scan, which she informed VDOC was simply her IUD. IUDs, like tampons and menstrual cups, constitute a medical device inextricably linked to the female sex, as

22

they are routinely used both for contraception and hormone regulation and are used only by females.[15] Thus, to commit an adverse employment action due to a female employee using an IUD violates Title VII, as such discrimination necessarily occurs against the female sex only. *See Bostock*, 140 S.Ct. at 661 (if discrimination would not have occurred "but for that individual's sex, [Title VII's] causation standard is met"). Moreover, using an IUD implicates one's childbearing capacity, a ground that Congress has recognized as protected by Title VII. Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k); *see Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) (noting that to distinguish between employees based on childbearing capacity is to distinguish based on sex).

VDOC conducted scans on Plaintiff Comer for two years, the length of her employment, but fired her only after it was informed that the anomaly — which would have been present on every past body scan — was an IUD, and within two days of receiving that information. (Compl. ¶ 59.) VDOC has not identified whether her past "suspicious scans" were different or identical to the one reviewed on the day that Plaintiff Comer informed her supervisor that she utilized an IUD. Thus, at this stage, it remains plausible that VDOC learned that Plaintiff Comer had an IUD, because it was flagged as suspicious on that day, then reviewed past body scans and saw the same anomaly and proceeded to fire her forthwith. In other words, Plaintiff has pled facts rendering it plausible that she was fired, because she utilized an IUD — a medical device inextricably linked with her sex and related to her childbearing capacity — in violation of Title VII.

---

[15]     *See* MacMillan, *supra* note 6.

In sum, the Court DENIES Defendant's Motion to Dismiss Count I of the Complaint. Each Plaintiff has pled facts rendering it plausible that they have a viable claim under Title VII's disparate treatment protections.[16]

### B. Count II — Disparate Impact in Violation of Title VII

To state a prima facie case for disparate impact under Title VII, a plaintiff must identify a facially neutral employment practice or policy that has "a significantly discriminatory impact" on a class protected by Title VII. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 265 (4th Cir. 2005). This requires more than conclusory allegations of a disparate impact and Plaintiffs must point to facts more specific than a "generalized policy that leads to such an impact." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). Instead, prevailing at this threshold requires "isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Id.* Once the specific employment practice has been identified, Plaintiffs "must allege either the existence of numerical or statistical evidence demonstrating disparate impact *or* sufficient factual detail of a series of discrete episodes of the contested employment practice in order to raise a plausible inference that [the employment practice] has a discriminatory impact on [the protected group]." *Medeiros v. Wal-Mart Inc.*, 434 F. Supp. 3d 395, 416 (W.D. Va. 2020) (emphasis added).

Here, Plaintiffs identify a neutral employment practice that causes a disparate impact as VDOC's retention of the right to either strip searching or terminate individuals whose body scans are flagged for having an anomaly. (ECF No. 12 at 17–18.) As noted, such scanners cannot tell the difference between contraband and a tampon, menstrual cup or IUD, which Plaintiffs contend causes a "significant discriminatory impact" on VDOC's roughly 6,000 female employees, a

---

[16]     This ruling has no bearing on the merits of Plaintiffs' class claim as to Count I.

protected class under Title VII. (*Id.*) In response, VDOC suggests that Plaintiffs have failed to allege that sufficient statistical information supports their claim. (ECF No. 11 at 25.) Moreover, VDOC argues that Plaintiffs have failed to plead a series of discrete episodes raising an inference of discriminatory impact, as they have only identified three incidents taking place months apart in three different correctional facilities that occurred under different circumstances. (*Id.*)

The viability of Plaintiffs' disparate impact theory boils down to (1) whether the instances described herein constitute a "series of discrete episodes" cognizable under Title VII or (2) whether they have demonstrated the statistics necessary for their claim to survive the motion to dismiss stage. As to this, the Court concludes that Plaintiffs have properly pled a series of discrete episodes that permit their disparate impact claim to survive the pleadings stage. Statistical and circumstantial evidence presented by Plaintiffs buttresses this conclusion; however, the statistical evidence provided does not, on its own, raise a plausible inference that VDOC's body scanner policy causes a disparate impact.

In Defendant's view, Plaintiffs present only three episodes, a trivial number that purportedly cannot give rise to an inference of discrimination. (ECF No. 11 at 15–16.) Defendant cites case law to this effect, as in *Medeiros*, the Western District of Virginia found that four women bringing claims of pay discrimination was not sufficient for their disparate impact claim, "in the context of [their] overall allegations." 434 F. Supp. at 418–19. And in *Wright v. Nat'l Archives and Recs. Serv.*, 609 F.2d 702 (4th Cir. 1979) — a case now over forty years old — the Fourth Circuit dismissed a disparate impact claim, because it was based on only three plaintiffs and some members of the group were not negatively affected by the challenged policy. 609 F.2d at 712.

Both cases cited by Defendant are inapposite to the facts presented in this case.  In *Medeiros*, the plaintiffs provided "no statistical evidence and their individual allegations undermine[d] their disparate impact claims." 434 F. Supp. 3d at 418.  And in *Wright*, only one plaintiff suffered any legally cognizable harm, which occurred due to a "sporadic discriminatory act" rather than "standard operating procedure." 609 F.2d at 712.  Here, by contrast, all three Plaintiffs present statistical evidence, in the form of VDOC's worker demographics, and the undisputed facts of female biology to support their claim that VDOC's standard operating practice causes a discriminatory impact.  For instance, Plaintiffs have described that there are around 6,000 females employed by VDOC, many of whom must pass through body scanners daily.  Moreover, the Court may infer that many, if not most, of these female employees menstruate and therefore utilize tampons or menstrual cups.  The Court may also infer that many of VDOC's female employees, like Plaintiff Comer, use IUDs.  Thus, while only three of these 6,000 female employees are explicitly named in this suit, the Court can infer that many more have been, and will be, discriminatorily affected by VDOC's facially neutral body scan policy.  Indeed, VDOC's own employee stated that strip searches occur to numerous female employees, because of the use of female hygiene products, "every year and each one of them feels just like you do right now."  (Compl. ¶ 43.)

The facts of this case are thus a far cry from the plaintiffs in *Medeiros* and *Wright*, who at times benefited from the policy that they challenged and were unable to extrapolate their harms so easily to other members of the affected class.  When the Court can plausibly infer that a facially neutral policy will affect the entirety of a protected class, a Title VII claim prevails at the pleading stage. *See Hung Ping Wang v. Hoffman*, 694 F.2d 1146, 1148 (9th Cir. 1982) (finding that plaintiff stated a claim for discriminatory impact at the pleadings stage, because a facially

neutral requirement "seemed on its face to have a disparate impact on minority applicants");
*Lynch v. Freeman*, 817 F.2d 380, 381 (6th Cir. 1987) (permitting a Title VII claim to survive on
a singular episode of discrimination, because it would reasonably affect all women).

Defendant also tries to downplay various facts relevant to Plaintiffs' case. However,
when every inference is taken in Plaintiffs' favor, such facts support rather than undermine the
disparate impact claim. For instance, Defendant notes that the three instances here occurred on
three different dates — November 10, 2021, April 4, 2022, and October 27, 2023. (ECF No. 11
at 15.) Taken in the light most favorable to Plaintiffs, this fact reveals that VDOC's policy has
been occurring for many years, making it an even graver issue than if it were only a temporary or
recent policy, or one no longer in force. Moreover, Defendant notes that each Plaintiff was
searched or questioned under different circumstances. (*Id.* at 15.) For example, each instance
occurred at a different correctional facility. At this stage, that fact highlights that nearly every
female employed by VDOC that must pass through a body scanner could be subject to a strip
search merely due to their menstrual cycle, regardless of which facility they work at, thus
highlighting the breadth of the disparate impact. Furthermore, three different female hygiene
products or medical devices led to Plaintiffs being strip searched or fired. Far from undermining
Plaintiffs' disparate impact theory, this fact supports it, as it shows that the policy affects women
regardless of their choice of tampon or menstrual cup, and even brings within its ambit those
using IUDs. *See Garcia v. Woman's Hosp. of Tex.*, 97 F.3d 810, 813 (5th Cir. 1996) (finding
that one episode was sufficient for a disparate impact claim, because the policy would affect
substantially all pregnant women).

Thus, the Court finds that when these three episodes are viewed within their context and
all inferences are taken in Plaintiff's favor, they amount to a series of discrete episodes that allow

27

the Court to plausibly infer that VDOC's body scanner policy has a significant discriminatory impact on VDOC's female employees. Plaintiffs have thus pled the required elements of a disparate impact claim and the Court therefore DENIES Defendants' Motion to Dismiss Count II as to each of the three named Plaintiffs.[17]

### C. Count III — Hostile Work Environment in Violation of Title VII

Only Plaintiffs McDowney and Patterson bring individual claims for hostile work environment in violation of Title VII, as only these two Plaintiffs were strip searched and those strip searches form the crux of this claim. (ECF No. 12 at 14 n.3.) To establish a hostile work environment claim, plaintiffs must allege that (1) they experienced unwelcome harassment; (2) the harassment was based on their sex; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there exists some basis for imposing liability on the employer. *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022). Defendant concedes that Plaintiffs experienced unwelcome harassment and that there exists a basis to impute liability to VDOC. (ECF No. 11 at 18.) Thus, the only points of contention are whether the relevant conduct occurred because of Plaintiffs' sex, to an extent that was severe and pervasive. Plaintiffs contend that such is the case, as VDOC created a hostile working environment by "forc[ing] Plaintiffs . . . to submit to a strip search or be terminated from employment because of sex, menstruation, use of feminine hygiene product[s], and/or use of birth control device." (Compl. ¶ 111.)

The Court rejects Defendants' argument that they did not harass Plaintiffs "because of sex" for the reasons previously articulated. Namely, that even if there exists a non-discriminatory basis for stopping, searching or firing Plaintiffs, that basis would not have existed

---

[17]    This ruling has no bearing on the merits of Plaintiffs' class claim as to Count II.

but-for Plaintiffs' sex, as menstruating and the use of an IUD predicated each stop. *See Hoyle,*

650 F.3d at 331 (stating that "[a]n employee is harassed or otherwise discriminated against

'because of' his or her gender if, 'but for' the employee's gender, he or she would not have been

the victim of the discrimination"). It does not matter that VDOC's SOP is not "meant to single

out or insult female employees based on their gender," or that it treats men and women similarly,

as "an employer cannot escape liability by demonstrating that it treats males and females

comparably as groups" or by showing that its discrimination stems "only in part because of sex."

*Bostock,* 140 S. Ct. at 1731, 1744. Regardless of intent, Plaintiffs were stopped and searched,

because they were menstruating or using an IUD. Both traits are inextricably linked with being a

female, and thus discrimination on those bases necessarily constitutes sex discrimination.

Thus, the Court turns to whether the strip searches at issue created a hostile environment

that was sufficiently severe and pervasive to alter the terms and conditions of their employment.

In the Fourth Circuit, "plaintiffs must clear a high bar in order to satisfy the severe or pervasive

test." *EEOC v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 315 (4th Cir. 2008). Discriminatory conduct

must be "aimed to humiliate, ridicule or intimidate" the victim to be actionable. *Jennings v.*

*Univ. of N.C.,* 482 F.3d 686, 695 (4th Cir. 2007) (en banc). In some circumstances, even a single

instance of misconduct can create a hostile work environment. For example, using a racially

charged epithet or sexually assaulting a co-worker both are serious enough to give rise to a

hostile work environment claim, even if such misconduct occurs only once. *Boyer-Liberto v.*

*Fountainebleau Corp.,* 786 F.3d 264, 264 (4th Cir. 2015) (racial epithet); *Berry v. Chicago*

*Transit Auth.,* 618 F.3d 688, 692 (7th Cir. 2010) (sexual assault).

The strip searches here, occurring only once, do not constitute harassment so severe and

pervasive to be actionable under Title VII. While Plaintiffs subjectively perceived the strip

29

searches to be severe and hostile, they must also show that such conduct is objectively severe and pervasive. *Perkins*, 936 F.3d at 208. The one-off events do not create such an objectively hostile environment. Where the Fourth Circuit has permitted a single event to substantiate a hostile work environment claim, the misconduct was uniquely egregious. For instance, where an African-American employee was twice called a "porch monkey" by her manager, an epithet so unparalleled in its odiousness that it has no place in civilized society, the Fourth Circuit concluded that a hostile work environment was created. *Boyer-Liberto*, 786 F.3d at 280. In the context of a prison, a strip search conducted with consent does not reach that level of disgust. Nor does it reach the levels of other circumstances where the Fourth Circuit has found a hostile work environment, like when a practicing Muslim was derided as a "towel head" and nicknamed "Taliban" due to his faith. *Sunbelt Rentals, Inc.*, 521 F.3d at 314. Unlike in that case, VDOC has not engaged in conduct that is uniquely egregious due to its sociopolitical context, nor was VDOC's conduct meant to degrade and humiliate Plaintiffs in any way comparable to the plaintiffs in *Sunbelt* and *Boyer-Liberto*.

The conduct here looks more like conduct that the Fourth Circuit has not deemed as severe or pervasive. For instance, in *Perkins*, the Fourth Circuit held that a few instances of racially discriminatory statements made remote in time relative to each other did not create a hostile work environment. 936 F.3d at 210. Indeed, even a series of sexually charged incidents may not give rise to a hostile work environment claim. *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754–55 (4th Cir. 1996) (series of sexual innuendos and provocative comments did not create a hostile work environment). Thus, the Court concludes that the strip searches and concomitant distress experienced by Plaintiffs are not actionable under Title VII's protections against hostile work environments. To hold otherwise would turn every unwelcome strip search

30

conducted by VDOC into a hostile work environment claim, an outcome the Court cannot reasonably entertain. The Court thus GRANTS Defendant's Motion to Dismiss Count III, as to Plaintiffs' individual as well as class claims.

### D. Count IV — Equal Protection Clause Violation Under 18 U.S.C. § 1983

The final claim brought by Plaintiffs runs against Defendant Dotson in his official capacity as the Director of VDOC. Plaintiffs seek only prospective injunctive relief in this Count. (Compl. ¶ 11.) "In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that [s]he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011). If these thresholds are met, plaintiffs must likewise plead facts demonstrating that "the disparity in treatment cannot be justified under intermediate scrutiny." *Monegain v. Dep't of Motor Vehicles*, 491 F. Supp. 3d 117, 141 (E.D. Va. 2020).

As a threshold matter, the parties dispute whether Plaintiffs are required to identify a similarly situated person, i.e., a comparator, as the face of the Complaint stands void of any such similarly situated party, which typically dooms an equal protection claim. Plaintiffs contend that they do not need to provide a comparator here, as there exists no way to compare a menstruating woman or a woman with an IUD to a similarly situated male, as men have no similar biological experience. Defendant suggests a higher level of abstraction should apply, and that the relevant comparator to Plaintiffs are "male prison employees who attempted to enter a Virginia prison and for whom the full-body body scanner detected an anomaly." (ECF No. 11 at 21.) Under Defendant's logic, Plaintiffs had the opportunity to find a comparator but failed, which should

end their equal protection claim. (ECF No. 11 at 21 (citing *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).).

Defendant's position does not persuade the Court. The purpose of the comparator in an equal protection case is to "isolate the factor allegedly subject to impermissible discrimination." *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996). This ensures that other factors do not muddy the equal protection analysis, because at bottom, an equal protection claim requires showing that one group was treated less favorably than another, on account of a protected class or characteristic. Defendant's preferred position fails to isolate the factor relevant to the discrimination that allegedly exists here — that Plaintiffs were discriminated against, because they were menstruating or of childbearing capacity. Indeed, Defendant's position attempts to revive the position that the Supreme Court rejected in *Bostock*. There, the Supreme Court rejected adopting a level of abstraction that would compare males and females as groups when the underlying discrimination pertained to their sexual orientation. *See Bostock*, 140 S.Ct. at 665 (recognizing that "an employer cannot escape liability by demonstrating that it treats males and females comparably as groups").[18] Rather, the Supreme Court indicated that the proper comparison was homosexual males and heterosexual males, as that comparison isolated the factor — sexual orientation — at the heart of the plaintiffs' Title VII claim. *Id.*

Of course, this does not answer what courts ought to do when no comparator group exists, as is the case with women that experience discrimination due to menstruation or the use of IUDs. Here, the Court uses Title VII jurisprudence to inform its § 1983 analysis, as the Fourth

---

[18]     For the same reason, the Court finds *Coleman v. Bobby Dodd Institute, Inc.*, 2017 WL 2486080 (M.D. Ga. June 8, 2017) unpersuasive, despite Defendant's contention that it should guide this case. (ECF No. 13 at 4.) Besides not being binding on the Court, that decision preceded *Bostock* and its holding relies on logic that *Bostock* undermined — if not rejected.

Circuit has held that "claims of racial discrimination in employment . . . under § 1983 are evaluated under the Title VII framework." *Swaso*, 698 F. App'x at 747. While evaluating the instant claim of sex discrimination in employment brought under § 1983 with reference to Title VII would constitute a modest extension of that holding, the Court finds it warranted under the circumstances of this case. *See Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003) (applying Title VII sexual harassment standards to § 1983 Equal Protection claim). The Fourth Circuit's analysis in *Bryant* likewise supports this extension. There, the Fourth Circuit noted that "[w]e would never hold, for example, that an employer who categorically refused to hire black applicants would be insulated from judicial review because no white applicant had happened to apply for a position during the time frame in question." 333 F.3d at 545. In other words, a claim for discrimination brought under § 1983 cannot be defeated by the practical impossibility of finding a comparator group, a principle relevant here given that men do not have a justification for having anomalies detected in their body cavities, unlike menstruating women.[19]

When claims are brought under Title VII for racial discrimination in the workplace, no comparator is required provided that a plaintiff "can establish an inference of unlawful discrimination through other means." *Swaso*, 698 F. App'x at 747. Thus, a claim brought to enforce the Equal Protection Clause under § 1983 for racial discrimination likewise does not need a comparator. Given that sex discrimination stands analogous to racial discrimination, the Court concludes that Plaintiffs in this case likewise may proceed without a comparator, provided

---

[19]     This group — men with a justification for having an anomaly detected in a body cavity — would qualify as the appropriate comparator group for Plaintiffs, who are women with a justification for having an anomaly detected in a body cavity. There exists no evidence that a male comparator group like that exists among VDOC's employees, and therefore Plaintiffs' failure to recognize it stands immaterial.

that Plaintiffs meet the standards for sex discrimination in violation of Title VII. Thus, if Plaintiffs can establish an inference of sex discrimination, their equal protection claim may survive this part of the analysis, even if no comparator exists.

Here, Plaintiffs have established an inference of impermissible sex discrimination. As noted above, there are various indicia that give rise to an inference of discrimination. Plaintiffs McDowney and Patterson were stopped and strip searched, because they were using female hygiene products while menstruating, and were threatened with future strip searches based on that same condition. VDOC employees likewise noted that many women had been stopped and strip searched, because they were menstruating or of childbearing capacity, and each reportedly felt severe emotional distress, which indicates that these were not isolated occurrences. (Compl. ¶ 43.) And Plaintiff Comer was fired just two days after being confronted by prison officials when her IUD was flagged as an anomaly by VDOC's body scanners. (*Id.* ¶ 59.) At this stage, such facts give rise to an inference of sex-based discrimination, and Plaintiff's equal protection claim passes this step of the analysis.

The next step in the equal protection analysis requires that Plaintiffs demonstrate that the unequal treatment stemmed from a "discriminatory animus." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). At this stage, where the Court takes every inference in their favor, the Court finds that Plaintiffs have made out a plausible case that VDOC's strip search policy demonstrates a discriminatory animus toward menstruating women and women of childbearing capacity. Indeed, this Court is not the first to conclude as much. *See, e.g.*, *Flores*, 2023 WL 6304680, at *2 (concluding that a reasonable juror could "conclude that, as a result of the prejudicial training they received, [VDOC employees] harbored a discriminatory bias against

34

females with respect to the perceived likelihood that contraband smuggled into [the prison] will come through females' lower body cavities").

Numerous facts, when taken together and drawing every inference in Plaintiff's favor, indicate that VDOC has acted with an animus toward a protected class in administering its body scanner policy. VDOC admitted on numerous occasions that its scanners could not distinguish between illicit contraband and female hygiene products, yet never implemented a policy or procedure to account for the fact that this would ultimately subject its menstruating employees and those with female medical devices to strip searches at a far greater frequency than male employees. (Compl. ¶ 21.) At best, this demonstrates a reckless indifference to VDOC's employees that menstruate and are of childbearing capacity.

Compounding VDOC's indifference is the training that VDOC administered regarding its body scanners, training that was contradicted by its own data. For example, VDOC instructed its employees that "most contraband will be concealed in the woman['s] internal body cavity." (*Id.* ¶ 24.) However, its own data indicated otherwise, as only nine percent of contraband detected at its facilities was in any body cavity, let alone that of women specifically. (*Id.* ¶ 25.) VDOC has not provided evidence that it has since updated its trainings, even though it has indicated that other allegations in Plaintiffs' Complaint are outdated, and the Court thus assumes its erroneous trainings are still in operation today. (ECF No. 11 at 24 n.13.) Taken together and with every inference drawn in Plaintiffs' favor, these facts imply that Director Dotson, the individual responsible for VDOC's trainings, has "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 n.2 (4th Cir. 1995). That VDOC has used and apparently continues to use training materials that it knows is infected with errors, as

indicated by its own data, is "unexplainable on grounds other than" discriminatory intent. *Burke v. Clarke*, 842 F. App'x 828, 838 (4th Cir. 2021). Plaintiffs have thus plausibly pled that VDOC's body scanner policies manifest an animus toward menstruating women. *Accord Flores*, 2023 WL 6304680, at * 2 (concluding the same under circumstances substantially identical to those here).

The final step in the equal protection analysis tests the law or policy's justification by subjecting it to intermediate scrutiny.[20] Here, VDOC must demonstrate that its body scanner policy is "substantially related to a sufficiently important governmental interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985). Historically, prison administrators have been afforded "wide-ranging deference . . . in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Moreover, the Fourth Circuit has recognized "[w]ithout question, prison safety and security is a legitimate, indeed compelling, penological interest." *Morrison*, 239 F.3d at 660.

Given that precedent, the Court concludes that VDOC's body scanner policy stands substantially related to a sufficiently important government interest. The policy furthers the institutional security of prisons, meaning that it facilitates a sufficiently important government interest. The policy likewise stands substantially related to that interest. To be sure, the training behind the policy relies on "the mechanical application of traditional, often inaccurate,

---

[20]    The Court assumes without deciding that VDOC's body scanner policy should be subjected to intermediate rather than rational basis scrutiny. As VDOC notes, the policy is gender-neutral and related to prison safety, which are two reasons to subject it only to the least restrictive level of scrutiny. (ECF No. 11 at 27); *Washington v. Harper*, 494 U.S. 210, 223 (1990). However, because it survives intermediate scrutiny, the Court does not wade into determining whether it should merit only rational basis review, as the greater includes the lesser in this circumstance.

assumptions," rather than "reasoned analysis," which cuts against finding that the means-end fit is sufficiently correlated. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 726 (1982). However, given that there are few less intrusive means to effectively further the prison's legitimate goal of thwarting contraband, and due to legitimate separation of powers concerns related to judicial entanglement with prison administration, it passes intermediate scrutiny. *See Garrett v. Clarke*, 74 F.4th 579 (4th Cir. 2023) (Wilksinon, J., concurring) ("Courts should seek ways to avoid micromanaging prisons."). Accordingly, the Court GRANTS Defendant's Motion to Dismiss Count IV of the Complaint, both as to Plaintiffs' individual and class claims.

## IV. CONCLUSION

Plaintiffs have made out plausible individual claims for disparate treatment and disparate impact in violation of Title VII's prohibitions against sex discrimination. VDOC has used training materials that it knows are infected with errors and has failed to establish a policy that considers the fact that its female employees will be subject to strip searches orders of a magnitude more frequently than its male employees, purely due to sex-based characteristics. Plaintiffs have also forwarded allegations rendering it plausible that VDOC has terminated an employee, because she used an IUD, a medical device inextricably linked with the female sex. However, Plaintiffs have failed to plausibly plead that Defendant created a hostile work environment or discriminated against them in violation of the Equal Protection Clause. Consequently, for the reasons stated, the Court will GRANT IN PART and DENY IN PART Defendant's Motion to Dismiss, (ECF No. 10).

An appropriate Order shall issue.

Let the clerk file a copy of this Memorandum Opinion and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Dated: April 19, 2024